

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00 C 7349 | DATE | 12/23/2002 |
| CASE TITLE | Institutional Management, Inc. vs. Barton Peck | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: PMG and Hare's Motion to Strike is GRANTED in part and DENIED in part. Peck's Motion for Summary Judgment on PMG's Complaint is DENIED. Peck's Motion for Summary Judgment on Count V-IX of his counterclaim is DENIED. PMG's Motion for Summary Judgment on its Complaint is GRANTED and declaratory judgment is entered in its favor. The Motions for Summary Judgment of PMG, Hare and Custable on Counts V-IX of Peck's Counterclaim are GRANTED and Counts V-IX of Peck's Counterclaim are DISMISSED pursuant to Federal Rule of Civil Procedure 56.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | DEC 2 4 2002 | |
| | Notified counsel by telephone. | date docketed | 101 |
| ✓ | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | date mailed notice | |
| WAP | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

INSTITUTIONAL MANAGEMENT,
INC., an Illinois corporation
d/b/a POWER MEDIA GROUP,

    Plaintiff and
Counterclaim Defendant,

v.

BARTON PECK, individually and
as Trustee of the ROSE PECK
TRUST,

    Defendants and
Counterclaim Plaintiffs,

v.

FRANK J. CUSTABLE, JR. AND
BRAD HARE,

    Counterclaim Defendants.

Case No. 00 C 7349

Hon. Harry D. Leinenweber



## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Institutional Management, Inc.'s ("PMG") Motion for Summary Judgment on its Complaint for Declaratory Judgment, Defendants Barton Peck and the Rose Peck Trust's (collectively "Peck") Motion for Summary Judgment on PMG's Complaint and Motion for Summary Judgment on Counts V-IX of Peck's Amended Counterclaim (Counts I-IV were withdrawn), Counterclaim Defendant Frank J. Custable Jr.'s ("Custable") Motion for Summary Judgment on Counts V-IX of Peck's Amended Counterclaim, Counterclaim Defendants PMG and Brad Hare's ("Hare") Motion for

Summary Judgment on Counts V-IX of Peck's Amended Counterclaim, and PMG and Hare's Motion to Strike portions of Peck's Rule 56.1 submissions. The following summary of the case is drawn from the parties' Rule 56.1 Statements of Facts.

**BACKGROUND**

Sometime in 1999, attorney Barton Peck discovered an urgent need to invest approximately $79,000 in a company known as New Millennium Development Group ("NMDG"). In November 1999, an independent consultant introduced Peck to Frank Custable and Brad Hare, partners in Institutional Management, Inc. d/b/a Power Management Group ("PMG"). Peck informed Custable and Hare that he needed to borrow $79,000 immediately since time was of the essence to his potential investment in NMDG. As collateral for the contemplated loan, Peck offered 3,800,000 shares of stock in a company called National Health & Safety ("NHLT")(2,800,000 shares were held by Peck individually and 5,000,000 shares were held by the Rose Peck Trust). On November 23, 1999, Hare, Custable and Peck signed an agreement stating:

> Power Media agrees to loan [Peck] a total of $79,000 versus a total of 7,800,000 shares of [NHLT] as collateral. Power Media will complete two separate transactions for 2,800,000 shares and 5,000,000 shares for $28,000 and $51,000 respectively. You will have 40 days to repay the principal plus 10% interest. Power Media can begin funding immediately.

After this agreement was signed, Peck initiated the transfer of the NHLT shares. The shares were not transferred all at once, but were transferred in "bunches," with PMG transferring the appropriate amount of money directly to NMDG's account (for Peck's benefit) after receiving each new group of stock. Of the $79,000 exchanged for the stock, Peck acknowledges that he received the entire amount, with the exception of one $4,000 transfer which Peck claims was never made. Peck bases this assertion on the Affidavit statement of Sandra Beck, former Treasurer of NMDG, that she reviewed the relevant documents and could not find any record of the $4,000 wire transfer. PMG's Rule 56.1 submission does, however, contain record of the $4,000 in question being transferred from Institutional Management, Inc.'s account to NMDG's account on December 21, 1999.

Shortly after the November 23 agreement was executed, the parties began exchanging correspondence evincing an intent to transform their agreement from a collateralized loan into a sale of stock with an option to repurchase. Peck claims that he was always under the impression that the agreement was never anything other than a loan. This is an extraordinary claim. Granted, some of the correspondence between the parties does indeed mix language of sale and option with that of loan and repayment. Any ambiguity as to the nature of the transaction was, however, resolved by a new

agreement signed by the parties on February 4, 2000. That agreement states in relevant part that:

> Power Media has purchased a total of 7,876,050 shares of [NHLT] for a total of $79,000. Power Media paid a net amount of $43,100 to the Rose Peck Trust, after a $7,900 fee was paid to Ameriserve Financial Services. Power Media will allow you until May 1, 2000 to repurchase the shares, at a 15% premium over the original purchase price.

Moreover, on March 30, 2000, Peck sent a memo to Hare and Custable stating in relevant part:

> I have been informed by counsel that after my mother's tax return has been filed as well as her estate tax return, they will be audited. . . . We must show . . . the date our agreement was consumated [sic] and terms including the fact that the transaction involved a sale of stock and not a collateralized loan with a right to repurchase by May 1, 2000.

The parties' relationship began to sour when, in response to this letter, Custable replied as follows to Peck's March 30, 2000 request:

> According to our records it appears that you are already in default. The fax that you just sent was only one letter out of a long history of correspondence, most of it contradictory to your fax. . . . Power Media needs your assistance to make sure that we are all on the same page.

Attached to this letter was a questionnaire which posed several questions seeking to clarify Peck's understanding of the terms of the sale and the repurchase option. Over the following days, several letters were exchanged in which PMG asserted its belief

- 4 -

that the option had expired (the original loan agreement called for repayment in January 2000), and Peck asserted that May 1, 2000 was the option expiration date under the new agreement. On April 19, 2000, Custable sent a letter to Peck informing him that:

> Power Media will agree to honor your existing May 1, 2000 expiration date. Power Media stands ready, willing and able to deliver all 7,876,050 shares of NHLT . . . once you notify Power Media that the funds are available for transfer . . . If you still wish to extend the repurchase date beyond May 1, you should contact our office as soon as possible and perhaps arrangements can be made for an additional premium.

Numerous letters went back and forth in the days leading up to the May 1, 2000 repurchase deadline. On April 28, 2000, Custable informed Peck that PMG would extend the deadline to May 7, 2000. On May 3, 2000, Peck responded with a memo which begins "*I have repeatedly told you that I cannot rely upon your promises* as they have been proven to mean nothing." (emphasis added). Peck's May 3 letter makes no reference to Peck having the money necessary to exercise the option. On May 5, 2000, Hare and Custable sent a letter to Peck informing him that his option had expired.

On October 23, 2000, PMG filed an action for declaratory judgment in the Chancery Division of the Circuit Court of Cook County. That action, which seeks a declaration that Institutional Management, Inc. (d/b/a PMG) is the rightful owner of the NHLT stock, was subsequently removed to this Court. Peck then filed a Counterclaim against PMG, Hare and Custable alleging federal and

state civil RICO claims (Counts I-IV), violation of the Illinois Consumer Fraud Act (Count V), fraud (Count VI), "strict responsibility" (Count VII), negligent misrepresentation (Count VIII), and breach of contract (Count IX). Counts I-IV were voluntarily dismissed. Now before the Court are the parties' Cross-Motions for Summary Judgment and PMG and Hare's Motion to Strike.

## MOTION TO STRIKE

PMG and Hare move to strike portions of Peck's Affidavit (¶ 19) and Peck's Local Rule 56.1(a)(3) Statement (¶¶ 38-39). These paragraphs reference statements allegedly made by Peck's third-party witness, Daniel Imperato ("Imperato"), regarding confirmation of a loan from Imperato to Peck. On August 6, 2002, this Court granted in part a motion by Hare, ruling that any testimony by Imperato would be barred unless Peck produced Imperato for a deposition. Peck was never able to secure Imperato's appearance for a deposition. Indeed, there is evidence in the record suggesting that Imperato took extraordinary steps to avoid appearing for a deposition in this case, at one point informing Hare's attorney that he need not appear for a deposition because he had no knowledge of these matters.

Peck has now submitted an Affidavit in support of his Motion for Summary Judgment in which he seeks to introduce statements allegedly made by Imperato to Peck. The alleged statements by

Imperato are clearly hearsay as defined by Federal Rule of Evidence 802 and do not fall within any exception to that rule. Given Imperato's shenanigans in evading deposition for this case and Peck's inability, or unwillingness, to facilitate production of Imperato for deposition, the Court will not allow Peck to bring in the substance of Imperato's alleged statements through the back door of Peck's own Affidavit. Moreover, Peck himself characterizes this information as "irrelevant" - providing yet another basis for striking it from the record. PMG and Hare's Motion to Strike is therefore GRANTED in part and DENIED in part. The Court hereby strikes the third sentence from Paragraph 19 of Peck's Affidavit and the first sentence of Paragraph 39 of Peck's Local Rule 56.1(a)(3) Statement.

## CROSS-MOTIONS FOR SUMMARY JUDGMENT

### Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). A court must "review the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Vanasco v. National-Louis University*, 137 F.3d 962, 964 (7th Cir. 1998). Nevertheless, the party who bears the burden of proof on an

issue may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact that requires trial. *Warsco v. Preferred Technical Group*, 258 F.3d 557, 563 (7th Cir. 2001).

## DISCUSSION

### *PMG's Motion for Summary Judgment*

PMG asserts that there are no genuine issues of material fact precluding entry of summary judgment on its action for declaratory judgment, and requests that this Court enter a judgment declaring Institutional Management, Inc. to be the rightful owner of the NIILT stock previously owned by Barton Peck.

The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that "any court of the United States, upon the filing of appropriate pleadings, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Act does not, standing alone, supply a district court with subject matter jurisdiction, nor does it dispense with the Article III "case or controversy" requirement. *In re VMS Securities Litigation*, 103 F.3d 1317, 1327 (7th Cir. 1996). As to the case at bar, the Court is satisfied that diversity jurisdiction exists, that there is an actual controversy ripe for decision, and that issuance of a declaratory judgment would serve a useful purpose in clarifying the legal obligations and relationships among the parties. *See*

*Nationwide Insurance v. Zavalis*, 52 F.3d 689, 692 (7th Cir. 1995). Peck argues in opposition to PMG's Motion for Summary Judgment that the Court cannot grant PMG's request for declaratory judgment because (1) Institutional Management is not a proper party to this case and (2) PMG did not fulfill its contractual obligations. The Court will first address the issue of Institutional Management's standing to sue.

Peck believes that, as a matter of Illinois law, Institutional Management has no standing to seek a declaratory judgment in its favor because Peck "never heard of [Institutional Management] until long after the relationship between the parties had broken down" and because Power Media Group is not a registered assumed name of Institutional Management, Inc. Peck's repeated assertion that Institutional Management was never involved in the transaction is puzzling: even a cursory review of the record reveals that, although most of Hare and Custable's dealings were done under the name of Power Media Group, *all* of the wire transfers exchanged for the NHLT stock were drawn from the account of Institutional Management, Inc. Contrary to Peck's assertion, Illinois *does* allow a party operating under an assumed name to sue and be sued even though it has failed to register that name under the Illinois Assumed Business Name Act, 805 ILCS 405/0.01 *et seq.* See *Thompson v. Cadillac*, 543 N.E.2d 308, 310 (Ill. App. 2d Dist.

1989). Institutional Management, Inc. d/b/a Power Media Group has standing to sue under Illinois law.

Peck also argues that declaratory judgment in PMG's favor is inappropriate because PMG failed to meet several of its contractual obligations. Before evaluating Peck's arguments, the Court must first address Peck's insistence on characterizing this agreement as a collateralized loan rather than a sale of stock with an option to repurchase. True, this transaction began as loan of approximately $79,000 collateralized by the shares of NHLT held by Peck and the Rose Peck Trust. Peck maintains his position that this transaction remained a loan agreement only by ignoring the existence of the February 4, 2000 letter. The clear and unambiguous language of that letter plainly indicates that the terms of the agreement had been renegotiated for new consideration: Peck now had more time to secure the money needed to redeem the stock from PMG and Peck agreed to pay an additional premium to PMG should he chose to exercise the option. Peck also chooses to ignore his own letter of March 30, 2000 in which he insists that PMG provide the IRS with a statement setting forth the terms of their agreement, "including the fact that the transaction involved a sale of stock and *not* a collateralized loan with a right to repurchase by May 1, 2000." (emphasis added) Whatever prior agreements or understandings existed between the parties, the February 4, 2000 agreement clearly transformed the arrangement into

a sale of stock with an option to repurchase which expired on May 1, 2000. Did PMG fulfill its obligations under that agreement? Peck puts forward four instances in which he claims PMG failed to uphold its end of the deal.

First, Peck argues that PMG failed to provide $4,000 of the $79,000 promised. The only evidentiary support for this assertion is the Affidavit of Sandra Beck, the former Treasurer of NMDG, who stated that she reviewed materials provided to her by PMG's counsel and could find no such record. The record submitted by PMG does, however, include a statement issued by NMDG's own bank showing receipt of the $4,000 in question via wire transfer from Institutional Management's account on December 21, 1999. As Peck acknowledges that the rest of the sum was transferred to NMDG for his benefit, there is no genuine issue as to whether PMG supplied the full $79,000 promised.

Second, Peck claims that PMG did not provide the funds "immediately," as required by the agreement. Consistent with the general approach taken in this case, Peck chooses to ignore a key fact: the transfer of funds was staggered over approximately 45 days *only* because the shares of NIILT were themselves transferred to PMG in "bunches" of shares spread intermittently over that same period. It is clear from the record that PMG wired payments proportional to the number of shares transferred shortly after each new bunch of shares was received. Moreover, there is no evidence

that Peck was damaged by the delay. In his deposition, Peck actually concedes that any delay in the transfer of funds by PMG did not prevent him from purchasing the NMDG stock on the terms he desired.

Third, Peck claims that PMG repudiated the contract by statements contained in the April 10, 2000 letter. In Illinois, anticipatory repudiation requires a clear manifestation of an intent not to perform the contract on the date of performance. *In re Marriage of Olsen*, 528 N.E.2d 684, 686 (Ill. 1988). Doubtful and indefinite statements that performance may or may not take place are not enough to constitute anticipatory repudiation. *Id.* The April 10, 2000 letter that Peck characterizes as a repudiation states:

> According to our records it appears that you are already in default. The fax that you just sent was only one letter out of a long history of correspondence, most of it contradictory to your fax. . . . Power Media needs your assistance to make sure that we are all on the same page.

At most, this is an indefinite statement regarding PMG's willingness to honor the May 1 option expiration date. The statement is certainly not a clear manifestation of an intent to repudiate the option should Peck come up with the money by May 1, 2000. The April 10, 2000 letter was not an anticipatory repudiation of the parties' agreement.

Finally, Peck argues that in light of his continued inability to raise the funds to repurchase the NHLT stock, on April 28, 2000, PMG extended the option expiration date to May 7 and then, on May 5, breached this new agreement by prematurely informing Peck that his option had expired. PMG acknowledges that Custable told Peck on April 28, 2000 that PMG would hold the option open until May 7, 2000. The record supports PMG's contention that there was no consideration exchanged for this promise to extend the deadline to May 7, 2000. As a promise unsupported by consideration, the offer could be enforced only under the theory of promissory estoppel - requiring Peck to establish detrimental reliance. *See Jeffrey M. Goldberg & Assoc., Ltd. v. Collins Tuttle & Co., Inc.*, 637 N.E.2d 1103, 1108 (Ill. App. 1st Dist. 1994). However, Peck's written response to PMG's offer to extend the deadline begins with the statement "I have repeatedly told you that *I cannot rely upon your promises* as they have proven to mean nothing." (emphasis added.) Peck's own words prevent him from establishing that he relied on this promise to his detriment. Although Peck strives mightily to portray PMG as frustrating his diligent efforts to repurchase the stock, the record indicates that the only thing hindering Peck's ability to exercise the option was his own inability to raise the necessary money.

Having reviewed the agreement and the record of the parties' performance, the Court finds that there is no genuine issue of

material fact as to whether PMG performed its obligations under the parties' agreement. Accordingly, Peck's Motion for Summary Judgment on PMG's Complaint is DENIED and PMG's Motion for Summary Judgment on its Complaint for Declaratory Judgment is GRANTED. The Court enters judgment for PMG and declares that:

(1) PMG met its contractual obligations to Peck; and

(2) Institutional Management, Inc. (d/b/a PMG) is the lawful owner of the 7,876,050 NHLT shares sold to Institutional Management, Inc. by Barton Peck and the Rose Peck Trust.

Although this resolves the issue of the ownership of the NHLT stock, the Court must still address Peck's numerous claims against Hare, Custable and PMG.

### Peck's Counterclaim for Breach of Contract

The basis for Peck's breach of contract claim are those already discussed above: (1) PMG's alleged failure to transfer the full $79,000 promised; (2) PMG's purported failure to provide the funds "immediately"; (3) the "repudiation" contained in the April 10, 2000 letter; and (4) PMG's "breach" of the new May 7, 2000 deadline on May 5, 2000. For the reasons stated above, the Court finds no factual basis in the record for any of these alleged breaches of the agreement between Peck and PMG. Peck's Motion for Summary Judgment on Count IX is therefore DENIED and the motions of Custable, Hare and PMG for summary judgment on Count IX are GRANTED.

### Peck's Counterclaim for Violation of the Illinois Consumer Fraud and Deceptive Practices Act

Count V of Peck's Counterclaim alleges that PMG, Hare and Custable violated the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA"), 720 ILCS 5/17-1 et seq., through numerous alleged misrepresentations. The Counterclaim Defendants argue that the Court need not reach the merits of the claim because ICFA may only be applied to remedy the impact of statutorily prohibited practices on Illinois consumers. According to PMG, Wisconsin residents therefore have no standing to invoke ICFA. Illinois courts have split on this issue and the Illinois Supreme Court has, to date, not given any indication of its position. This Court agrees, however, with the conclusion that the Illinois Supreme Court would hold that ICFA's remedies are available to citizens of Illinois exclusively. See Swartz v. Schaub, 818 F.Supp. 1214, 1214 (N.D. Ill. 1993). Accordingly, the Court DENIES Peck's Motion for Summary Judgment on Count V of his Counterclaim and GRANTS the motions of Custable, Hare and PMG for summary judgment on Count V.

### Peck's Counterclaim for Fraud

As an initial matter, the Court notes that the Moorman doctrine *does* allow recovery of economic loss against a defendant who intentionally makes false representations and, contrary to PMG's position, Peck's fraud claim is not barred by the Moorman doctrine. See Moorman Mfg. Co. v. National Tank Co., 435 N.E.2d

443, 452 (Ill. 1982). To establish a claim for fraud in Illinois, Peck must present facts sufficient to establish: (1) a false statement; (2) of material fact; (3) which PMG knew or believed to be false; (4) made for the purpose of inducing Peck to act; (5) which Peck believed and justifiably relied on; and (6) damage suffered by Peck as a result. *See Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996). Peck points to four separate statements as the basis for his fraud claim: (1) PMG agreed to turn over the $79,000 immediately; (2) PMG represented that it needed the ability to sell or collateralize the stock to provide the funds immediately; (3) PMG promised to honor the May 7, 2000 extension; and (4) PMG represented that it made the $4,000 wire transfer. The record does not support a claim for fraud based on any of these statements.

First, the statement that the $4,000 wire transfer had been made was true: the record submitted by PMG includes a statement issued by NMDG's bank showing receipt of the $4,000 in question via wire transfer from Institutional Management's account on December 21, 1999. Second, there is no evidence supporting an inference that the statement that PMG would turn over the proceeds immediately was false when made: the record indicates that the funds were paid out sporadically only because Peck himself delivered the shares of NHLT in batches spread out over several weeks. Moreover, Peck stated in his deposition that he was not

damaged by this holdup and that he was still able to have the money invested in NMDG to his satisfaction despite the delay. Third, Peck offers absolutely no evidence supporting his contention that he was damaged by PMG's statement that it needed the ability to sell or collateralize the NHLT stock, nor has he established that this particular statement caused any detrimental reliance on Peck's part. Finally, PMG's promise to hold the option open to May 7, 2000 cannot form the basis for a fraud claim. Fraud may not be based on representations regarding future conduct, or on broken promises. *Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1298 (7th Cir. 1993); *Advent Electronics, Inc. v. Buckman*, 918 F.Supp. 260, 264 (N.D. Ill. 1996). Moreover, Peck's May 3, 2000 response to the promise to extend the deadline – "I cannot rely upon your promises as they have proven to mean nothing" – clearly establishes that he was *not* relying on this promise in any way. Peck has failed to establish the necessary elements of fraud for any of the statements he imputes to the Counterclaim Defendants. The Motions for Summary Judgment of PMG, Hare and Custable on Count VI are therefore GRANTED and Peck's Motion for Summary Judgment on Count VI is DENIED.

### Peck's Counterclaim for "Strict Responsibility"

Count VII alleges an action for "strict responsibility." The Court could not find any argument supporting or defending this claim in any of Peck's submissions. The Court assumes that this silence stems from the fact that there is no such cause of action.

Assuming, *arguendo*, that Peck intended to state a cause of action for strict liability, that theory has no place in an action alleging fraud in the sale of stock. See generally *Heller v. Cabral Corp.*, 406 N.E.2d 88 (Ill. App. 1st Dist. 1980). The Motions for Summary Judgment of PMG, Hare and Custable on Count VII are therefore GRANTED and Peck's Motion for Summary Judgment on Count VII is DENIED.

### Peck's Counterclaim for Negligent Misrepresentation

Count VIII states a claim for negligent misrepresentation against PMG, Custable and Hare. In *Moorman Mfg. Co. v. National Tank Co.*, 435 N.E.2d 443 (Ill. 1982), the Illinois Supreme Court set out its economic loss doctrine, barring tort recovery for purely economic losses. An exception does exist, however, for instances in which the allegedly negligent party is in the "business of supplying information for the guidance of others." *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 679 N.E.2d 1197, 1200 (Ill. 1997). In this case, any information supplied by Custable and Hare was merely ancillary to the sale. There is nothing in the record to support a finding that Hare and Custable were in the business of supplying information so as to subject them to liability under that exception to the *Moorman* doctrine. See *Id.* at 1201. Peck's claim for negligent representation is therefore barred by the *Moorman* doctrine and the Motions for Summary Judgment of PMG, Hare and Custable on Count VIII are

accordingly GRANTED and Peck's Motion for Summary Judgment on Count VIII is DENIED.

## CONCLUSION

For the reasons set forth above, PMG and Hare's Motion to Strike is **GRANTED** in part and **DENIED** in part. Peck's Motion for Summary Judgment on PMG's Complaint is **DENIED**. Peck's Motion for Summary Judgment on Counts V-IX of his Counterclaim is **DENIED**. PMG's Motion for Summary Judgment on its Complaint is **GRANTED** and declaratory judgment is entered in its favor. The Motions for Summary Judgment of PMG, Hare and Custable on Counts V-IX of Peck's Counterclaim are **GRANTED** and Counts V-IX of Peck's Counterclaim are **DISMISSED** pursuant to Federal Rule of Civil Procedure 56.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Date: November 23, 2002